**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

| | |
|---|---|
| NANCY MAZZA, individually and on behalf of all others similarly situated, | Plaintiff's Address and County<br>207 S Main St North East MD 21901<br>Cecil County |
| Plaintiff, | 1:23-cv-02470 |
| - against - | Class Action Complaint |
| ALBERTSONS COMPANIES, INC., | Defendant's Address<br>250 Parkcenter Blvd Boise ID 83706 |
| Defendant | Jury Trial Demanded |

Plaintiff Nancy Mazza ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    Albertsons Companies, Inc. ("Defendant") manufactures and sells adhesive lidocaine patches under the Signature Care brand ("Product").



2. The front label representations include "Maximum Strength," "Lidocaine Patches," "Lidocaine 4%/Topical Anesthetic," "Pain Relief for Back, Neck, Leg & Shoulder," "Desensitizes aggravated nerves & relieves pain," "Medicated for targeted pain relief," "Stay-put flexible patch," "No-mess, easy to apply and remove," "Compare to Salonpas Maximum Strength Lidocaine Patch – * active ingredient" and "Odor free," with a humanoid figure with a lidocaine patch applied to the lower back through which a dark vertical line corresponding with the body's spine, appears indicative of the Product's ability to relieve, decrease and/or eliminate pain.

## I.   LEGAL BACKGROUND

3. Research shows that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging to evaluate [any] product," thereby "develop[ing] sensory expectations" about its attributes and abilities.[1]

4. Consistent with these principles, Congress passed the Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938, which set standards and regulations for what companies were required to tell consumers about over-the-counter ("OTC")

---

[1] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

medications they sell. 21 U.S.C. § 301 *et seq.*; 21 C.F.R. Parts 200 and 300.

5.     This State adopted these laws in their entirety through the Maryland Food, Drug, and Cosmetic Act ("MFDCA"). Md. Code, Health-General § 21-101 *et seq.*; Md. Code, Health-General § 21-235 ("Conformance of State Rules and Regulations").

6.     These laws consider a drug "misbranded" and misleading if its labeling is false or misleading. 21 U.S.C. § 352(a); Md. Code, Health-General § 21-217(b).

## II.   LIDOCAINE BACKGROUND

7.     Lidocaine is a topical anesthetic used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain.

8.     Doctors discovered that lidocaine patches are effective in treating general neuropathic pain like muscle and spinal aches and began prescribing the patches off-label.

9.     A 2012 study found that over 82% of the usage of prescription lidocaine patches were off label.

10.   As the use of lidocaine patches increased, national brands such as Salonpas and Aspercreme spend significant amounts of money to advertise their OTC patches as equivalent to those available only with a prescription.

11.   In 1983, the Food and Drug Administration ("FDA") issued

requirements for the labeling, ingredients, uses, and doses of external analgesic products, allowing the use of lidocaine at 4% in the form of an ointment.

12.   The first lidocaine patch was approved in 1999 to help reduce pain associated with post-herpetic neuralgia ("PHN"), a complication of shingles.

13.   In 2003, the FDA began review of OTC patches to determine the safe and effective concentration of lidocaine in this format.

14.   In 2013, the FDA concluded that lidocaine patches were not "generally recognized as safe and effective" for OTC use because there was insufficient information about how often the plaster or poultice needed to be changed.

## III.  PRODUCT FAILS TO DELIVER LIDOCAINE IN PROMISED WAY DUE TO ADHESION DEFECTS

### A. How Lidocaine Patches Work

15.   Lidocaine patches like the Product use transdermal/topical delivery systems ("TDS") with three main parts: (1) an outer protective backing membrane, (2) a drug-in-adhesive layer, and (3) a release liner that controls the rate and extent of drug administration.

16.   This is a different method of delivering medication, and the strength cannot be determined based on the FDA regulations.

17.   Manufacturers of lidocaine patches attempt to get their patches to meet the FDA's 4% benchmark based on the mass of drug relative to the mass of the adhesive per patch.

18.   However, the amount of lidocaine contained in, or delivered by, a lidocaine patch cannot be determined based on the arbitrary measure of a patch's drug-to-adhesive ratio.

19.   This allows Defendant to alter the total mass of lidocaine contained in the Product by adjusting the thickness of the patches' back membrane without changing its dimensions.

20.   This drug-to-adhesive ratio is misleading to consumers and doctors alike, who ordinarily expect that the percentage of an active ingredient in a drug has a direct correlation to the quantity, or efficacy, of that ingredient within the drug.

B.  Adhesion Failure Defects

21.   Since adequate adhesion is critical for such delivery systems, if a patch lifts or detaches while walking, sleeping or exercising, dosing will be compromised.

22.   The FDA Adverse Events Reporting System ("AERS") revealed that approximately 70% of consumer complaints about such products, including upon information and belief, Defendant's Product, relate to their poor adhesion.

23.   The FDA concluded that such patches systemically fail to adhere to the body and cannot provide the claimed pain relief.

24.   This is in line with complaints made by purchasers of the Product to Defendant about its lack of adhesion abilities.

25.   A peer-reviewed study published in January of 2021 by the Journal of

Pain Research found that none of the generic prescription lidocaine patches analyzed exceeded ninety percent adhesion within the twelve-hour testing period.

26.   Rather, their average adhesion after twelve hours was less than forty percent.

27.   This was based on a scale where zero percent reflects complete detachment and fifty percent reflects half the patch lifting off the skin but not detached.

28.   This is especially notable because the study required participants to be sedentary while the patches were applied, whereas typical users are active and trying to function as they otherwise would, i.e., walking, exercising, etc.

29.   Although the study tested generic lidocaine patches, upon information and belief, the Product, upon information and belief, the Product uses the same defective adhesion technology and has not undergone the rigorous approval process by the FDA.

30.   Though other companies have innovated their technology based on clinical studies to ensure that their lidocaine patches are sufficiently flexible to adhere to a consumer's body during exercise and other everyday activity, upon information and belief, Defendant has not.

31.   This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may

be compromised and there is an increased risk of inadvertent exposure to others."

32.  Since the Product cannot "Stay-put" to a person's skin for the industry-recognized clinically significant period, estimated at not less than eight hours, it cannot deliver the active anesthetic ingredient of lidocaine during that time.

33.  When consumers see the promise that the patch will "Stay-put" to "Desensitize[] aggravated nerves & relieve[] pain," because the Product is "medicated for targeted pain relief," they will expect it will adhere to their bodies for no less than the clinically significant time period, estimated at not less than eight hours.

34.  The Directions on the back panel Drug Facts confirm the front label's "Stay Put" message, instructing users to "Use one patch for up to 12 hours" and then "Discard patch after single use."

**Directions**
Adults and children 12 years of age and over: Clean and dry affected area. Carefully remove backing from patch starting at a corner. Apply sticky side of patch to affected area. Use one patch for up to 12 hours. Discard patch after single use. Children under 12 years of age: consult a physician.

35.  However, the Product cannot "Stay-put" for any time even approaching twelve hours, which renders the Directions misleading, because it assumes it will not have detached by then.

36.  Studies have shown the Product or similarly manufactured and designed products are unable to adhere to skin for more than four hours, often peeling off within minutes of light activity, which renders the promise it will "Stay-put"

misleading, because there is a significant disparity between what is promised and what is delivered.

## IV. MAXIMUM STRENGTH CLAIM IS MISLEADING

37.   The representation of "Maximum Strength" is misleading for multiple reasons.

38.   First, there are superior prescription lidocaine patches on the market that deliver a higher amount of lidocaine, including 5% and 1.8% prescription-strength lidocaine patches.

39.   Adhesive technology exists which delivers the bioequivalence of 5% lidocaine in patch form and maintain adhesion for at least twelve hours under normal conditions.[2]

40.   Second, the FDA cautioned manufacturers of OTC analgesic products against making "maximum strength" claims because higher strength and greater potency versions of such items were available with a prescription.

41.   Third, the FDA knew other more concentrated and potent similar products could appear in proximity to those represented as "maximum strength" on store shelves.

42.   The result would be that consumers would be misled when other

---

[2] In studies, this technology maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

companies labeled their products as "regular strength," even though both had the same amount of medication and/or active ingredients.

43.   Fourth, given that the Product is explicitly compared to Salonpas on its front label, "maximum strength" is misleading because the Signature Care product contains roughly forty percent less lidocaine, even though they have similar or identical dimensions.

44.   Fifth, numerous studies and reports revealed that users of adhesive lidocaine patches using the same technology used by the Product regularly peel off a user's skin within three to four hours, and sometimes minutes, after being applied.

45.   Since, according to the FDA, the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch" delivered to the target area, these adhesion deficiencies cause the delivery and absorption of lidocaine to be greatly reduced.

46.   This inability to "Stay-put" for anywhere close to a clinically significant period means the Product cannot deliver the "Maximum Strength" amount of lidocaine.

## V.   DESENSITIZING CLAIMS

47.   The FDA determined that statements about desensitizing nerves and numbing pain were misleading in the context of these transdermal patch delivery systems.

48.   The Product's promise to "Desensitize[s] Aggravated Nerves" is misleading because it implies its use will completely block and numb nerves and pain receptors, eliminate responses to painful stimuli, and treat neuropathic and musculoskeletal pain, including back and spinal pain.

49.   This is because consumers, including Plaintiff, associate such statements with medical treatments requiring a prescription and FDA approval.

50.   However, the Product is available without a prescription and has not been approved by the FDA.

51.   The front label promise that the Product "Desensitizes aggravated nerves & relieves pain" is inconsistent and contradictory with its limited approval that it "Temporarily relieves minor pain," indicated only in the fine print of the Drug Facts on the back label.



52.   As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than approximately no less than $6.49 per box of six patches, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

53.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

54.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

55.   Plaintiff is a citizen of Maryland.

56.   Defendant is a citizen of Delaware based on its corporate formation.

57.   Defendant is a citizen of Idaho based on its principal place of business.

58.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

59.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at the approximately 60 Safeway stores in this State and online to citizens of this State.

60.   The Court has jurisdiction over Defendant because it transacts business within Maryland and sells the Product to consumers within Maryland from the approximately 60 Safeway stores in this State and online to citizens of this State.

61.   Defendant transacts business in Maryland, through the sale of the Product to citizens of Maryland from the approximately 60 Safeway stores in this State and online to citizens of this State.

62.   Defendant has committed tortious acts within this State through the

distribution and sale of the Product, which is misleading to consumers in this State.

63.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

64.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

65.   Venue is in this District with assignment to the Northern Division because a substantial part of the events or omissions giving rise to these claims occurred in Cecil County, which is where Plaintiff's causes of action accrued.

66.   Plaintiff purchased, used and/or consumed the Product in reliance on the labeling identified here in Cecil County.

67.   Plaintiff first became aware the labeling was false and misleading in

Cecil County.

68.  Plaintiff resides in Cecil County.

## PARTIES

69.  Plaintiff Nancy Mazza is a citizen of Cecil County, Maryland.

70.  Defendant Albertsons Companies, Inc. is a Delaware corporation with a principal place of business in Idaho.

71.  Defendant operates over 900 Safeway grocery stores in the United States.

72.  Safeway stores are in Alaska, Arizona, California, Colorado, Delaware, District of Columbia, Hawaii, Idaho, Maryland, Montana, Nebraska, Nevada, New Mexico, Oregon, South Dakota, Virginia, Washington, and Wyoming.

73.  While Safeway sells leading national brands of products, it also sells many products under one of its private label brands, Signature Care.

74.  Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

75.  Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

76.  Products under the Signature Care brand have an industry-wide reputation for quality.

77.  In releasing products under the Signature Care brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

78.  Safeway gets national brands to produce its private label items due its loyal customer base and tough negotiating.

79.  Private label products under the Signature Care brand benefit by their association with consumers' appreciation for the Safeway brand overall.

80.  That Signature Care branded products met this high bar was or can be proven by focus groups, rating them above their name brand equivalent.

81.  A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Signature Care] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

82.  Private label products generate higher profits for retailers like Safeway because national brands spend significantly more on marketing, contributing to their higher prices.

83.  The development of private label items is a growth area for Safeway, as they select only top suppliers to develop and produce Signature Care products.

84.  Plaintiff purchased the Product between August 2020 and the present, at Safeway locations in Cecil County, and/or other counties in this State.

85.  Plaintiff read and relied on the front label representations including

"Maximum Strength," "Lidocaine Patches," "Lidocaine 4%/Topical Anesthetic," "Pain Relief for Back, Neck, Leg & Shoulder," "Desensitizes aggravated nerves & relieves pain," "Medicated for targeted pain relief," "Stay-put flexible patch," "No-mess, easy to apply and remove," "Compare to Salonpas Maximum Strength Lidocaine Patch – * active ingredient" and "Odor free," and the humanoid figure with a lidocaine patch applied to the lower back through which a dark vertical line appeared indicative of the Product's ability to relieve, decrease and/or eliminate pain.

86.   Plaintiff purchased the Product to provide pain relief to her back, neck, legs and shoulders.

87.   Plaintiff saw the Product was labeled and marketed as "Maximum Strength" and capable of delivering 4% lidocaine which would "Stay-put" and would "Desensitize[] aggravated nerves & relieve[] pain," by providing "targeted pain relief" to the areas it was applied.

88.   Plaintiff believed and expected the Product would reliably adhere to her body to deliver 4% lidocaine for at least several hours, based on her awareness of the abilities of national brands of lidocaine patches like Salonpas.

89.   Plaintiff believed and expected the Product contained the maximum strength of lidocaine available.

90.   Plaintiff believed and expected the Product would relieve pain in her

back, neck, legs and shoulders through desensitizing aggravated nerves.

91.    Plaintiff understood the statement that the Product would "Desensitize[]

aggravated nerves" to mean it would completely or substantially block and numb

nerves and pain receptors, eliminate responses to painful stimuli, and treat

neuropathic and musculoskeletal pain, including in her back, neck, spine, legs and

shoulders.

92.    Plaintiff bought the Product at or exceeding the above-referenced price.

93.    Plaintiff paid more for the Product than she would have had she known

the representations and omissions were unfair, false, deceptive and misleading, as

she would not have bought it or would have paid less.

94.    The Product was worth less than what Plaintiff paid, and she would not

have paid as much absent Defendant's false and misleading statements and

omissions.

**CLASS ALLEGATIONS**

95.    Plaintiff seeks to represent the following class:

> All persons in the State of Maryland who
> purchased the Product in Maryland during
> the statutes of limitations for each cause of
> action alleged.

96.    Common questions of issues, law, and fact predominate and include

whether Defendant's representations were and are misleading and if Plaintiff and

class members are entitled to damages.

97.   Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

98.   Plaintiff is an adequate representative because her interests do not conflict with other members.

99.   No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

100.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

101.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Maryland Consumer Protection Act ("MCPA"),
Commercial Law Art., Md. Code, § 13-101, *et seq.*

102.  Plaintiff incorporates by reference paragraphs 1-52.

103.  The purpose of the MCPA is to protect consumers against unfair and deceptive practices.

104.  Plaintiff believed the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours,

or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

105. Plaintiff paid more for the Product, would not have purchased it or paid as much if she knew that it (1) did not provide the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would not adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was not similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would not relieve pain in the targeted areas by desensitizing her nerves.

106. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under this State's consumer protection laws, by paying more for it than she otherwise would have.

107. Plaintiff will produce evidence showing how she and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations, using statistical and economic analyses, hedonic regression, and other advanced methodologies.

108. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

## COUNT II
<u>Breach of Express Warranty</u>

109. Plaintiff incorporates by reference paragraphs 1-52.

110. The Product was manufactured, identified, marketed, and sold by Defendant and expressly warranted to Plaintiff and class members that it (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

111. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and/or targeted digital advertising.

112. Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as OTC products of superior and high potency, and had qualities similar to prescription products and developed its marketing and labeling to directly meet those needs and desires.

113. Defendant's representations affirmed and promised that the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period,

understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

114. Defendant described the Product so Plaintiff and consumers believed it (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves, which became part of the basis of the bargain that it would conform to its affirmations and promises.

115. Plaintiff recently became aware of Defendant's breach of the Product's express warranty.

116. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and/or their employees.

117. Plaintiff hereby provides notice to Defendant that it breached the Product's express warranty.

118. Defendant received notice and should have been aware of these issues due to complaints by third parties, including regulators, competitors, and consumers,

to its main offices, and by consumers through online forums.

119. The Product did not conform to its affirmations of fact and promises due to Defendant's actions, because it (1) did not provide the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would not adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was not similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would not relieve pain in the targeted areas by desensitizing her nerves.

120. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## COUNT III
### Fraud

121. Plaintiff incorporates by reference paragraphs 1-52.

122. Plaintiff satisfied the requirements of fraud by establishing relevant elements with sufficient particularity.

123. WHO: Defendant, Safeway, made material misrepresentations and/or omissions of fact in its advertising and marketing of the Product by representing it (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of

lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

124. WHAT: Defendant's conduct was and continues to be fraudulent because it deceives consumers into believing the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

125. Defendant omitted telling consumers the Product (1) did not provide the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would not adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was not similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would not relieve pain in the targeted areas by desensitizing her nerves.

126. Defendant knew or should have known this information was material to all reasonable consumers and impacts their purchasing decisions.

127. Defendant conducted research on consumer purchasing habits and knew consumers of OTC products seek those of high potency, denoted by terms such as

"Maximum Strength," and which were comparable to the national brands, like Salonpas.

128. Defendant highlighted these attributes in selling the Product to consumers.

129. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

130. Yet, Defendant has represented and/or continues to represent that the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

131. WHEN: Defendant made these material misrepresentations and/or omissions detailed herein, continuously throughout the applicable class period and through the filing of this Complaint.

132. WHERE: Defendant's material misrepresentations and omissions, that the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically

significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves, were made in the advertising and marketing of the Product, on the front of the packaging, which all consumers buying would inevitably see and take notice of.

133. HOW: Defendant made written and visual misrepresentations and omissions in the advertising and marketing of the Product, that it (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves.

134. And as discussed in detail throughout this Complaint, Plaintiff and class members read and relied on Defendant's representations and omissions before purchasing the Product.

135. WHY: Defendant misrepresented that the Product (1) provided the maximum amount of lidocaine in patch form, either with or without a prescription, (2) would adhere to her body for a clinically significant time period, understood as at least eight hours, or very close to this length of time, (3) was similar in quality

and ability in terms of pain relief and adhesion, to the Salonpas brand of lidocaine patch and (4) would relieve pain in the targeted areas by desensitizing her nerves, for the express purpose of inducing Plaintiff and class members to purchase the Product at a substantial price premium, in part based on consumer demand for highly potent OTC products that were similar and equivalent to the national brands.

136. As such, Defendant profited by selling the misrepresented Product to thousands of consumers throughout this State.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   September 12, 2023

Respectfully submitted,

/s/Spencer Sheehan

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

*Spencer Sheehan*

*Sheehan & Associates, P.C.*